FILED

Jan 13 2025, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Adrian Cardenas,

*Appellant-Plaintiff*

v.

Hook-SupeRx, L.L.C. d/b/a CVS Pharmacy, et al.

*Appellees-Defendants*

---

January 13, 2025

Court of Appeals Case No.
24A-CT-1942

Appeal from the Marion Superior Court

The Honorable Kurt M. Eisgruber, Judge

Trial Court Cause No.
49D06-2102-CT-4808

---

**Opinion by Judge Mathias**
Judge Kenworthy concurs.

Judge Brown dissents with separate opinion.

**Mathias, Judge.**

Adrian Cardenas appeals the trial court's entry of summary judgment for Hook-SupeRx, LLC, d/b/a CVS Pharmacy ("CVS"). Cardenas raises two issues for our review, but we need only consider the following dispositive issue: whether a reasonable fact-finder could conclude from the designated evidence that a security guard at a CVS location, whose responsibilities included customer support, brand promotion, managerial support, and record-making for CVS, was an employee of CVS rather than an independent contractor for purposes of holding CVS liable for the security guard's on-duty tortious conduct.

We reverse and remand for further proceedings.

## Facts and Procedural History

In the fall of 2018, CVS entered into a Service Agreement with Single Source Security, d/b/a Protos Security ("Protos"). Pursuant to that agreement, Protos was "to perform management of security guard services" at various CVS locations upon CVS's request. Appellant's App. Vol. 2, p. 71.[1] The Service

---

[1] The cover page of volume 2 of the Appellant's Appendix misidentifies it as volume 1.

Agreement permitted Protos to use "its own employees and/or . . . subcontractors" to provide those services. *Id.* at 72.

[4] According to the Service Agreement, "[a]ll employees and independent contractors of [Protos] assigned to perform the Services for CVS contemplated by this Agreement shall have the requisite knowledge, expertise, and qualifications . . . necessary to perform such Services." *Id.* at 80. The Service Agreement required Protos's services to "meet the minimum CVS standards as detailed . . . herein." *Id.* at 72. And CVS reserved the right to terminate any such services that failed to conform to the stated requirements.

[5] As for CVS's stated requirements, the Service Agreement provided that the "[p]rimary purpose" of armed and unarmed guards was "to provide asset protection" and to "deter[] unwanted behavior." *Id.* at 96, 98. As detailed more extensively below, the Service Agreement provided for eleven responsibilities and duties of on-duty unarmed guards along with nine additional miscellaneous obligations. Similarly, the Service Agreement identified twenty-two responsibilities and duties of on-duty armed guards along with three additional miscellaneous obligations. The obligations of both armed and unarmed guards included customer support, brand promotion, managerial support, and record-making for CVS. The stated requirements also included instructing guards to try to avoid "physically restrain[ing] [a] person." *Id.* at 96, 98 (bold font removed).

[6] The Service Agreement described the relationship between CVS and Protos as follows: "[Protos] shall perform all [s]ervices hereunder as an independent

contractor and not as any agent or employee of CVS." *Id.* at 76. The Service Agreement likewise stated that, "[w]ith respect to subcontracting, . . . [a]ll of [Protos's] subcontractors' personnel provided through the services of [Protos] are independent contractors and the employees of [Protos's] subcontractors and are not the agents or employees of CVS or [Protos]." *Id.* The Service Agreement also provided that Protos would indemnify CVS and hold CVS harmless "from and against any claims, liabilities, and damages to the extent same are due to [Protos's] or [Protos's] subcontractors' (including subcontractor employees and agents) negligence, willful misconduct, or breach of this Agreement or . . . failure to comply with or abide by any applicable law . . . ." *Id.* at 77.

[7] Pursuant to the Service Agreement, in May 2019, CVS requested guard services at an Indianapolis location on Lafayette Road. Protos, in turn, subcontracted that work out to Shield Protection Solutions, LLC ("Shield"). And Shield employed Jeremiah Sedam to perform the guard services at that location.

[8] On May 11, 2019, nineteen-year-old Cardenas and two of his teammates traveled to Indianapolis from Illinois to participate in a semi-pro, third-division soccer match in the United Premier Soccer League. The three arrived early for the match and went across the street to the Lafayette Road CVS for some snacks and drinks. Cardenas was wearing a hoodie with the hood up as he entered the store, and Sedam, who was at the front doors, told Cardenas to "take [the] hoodie off." Appellant's App. Vol. 4, p. 40. Cardenas noted that Sedam "was looking at [him] really aggressive[ly]." *Id.* Sedam told Cardenas,

"you better f**king listen to me." *Id.* at 41. Cardenas then removed the hoodie, and he and his teammates went to the bathroom.

[9] After using the bathroom, the three went over to the area of the store displaying drinks for sale. They were "talking" and "laughing" and "looking at what [they were] going to drink." *Id.* at 45. Cardenas "absentmindedly" put his hoodie back on. *Id.* at 59. Sedam then "scream[ed] from across the store," saying, "what the f**k dude, I f**king told you, what did I tell you about your f**king hoodie." *Id.* at 46. Cardenas was "shocked" by Sedam's conduct and took the hoodie back off. *Id.* Cardenas told Sedam, "relax, bro, . . . I forgot." *Id.* And Sedam replied, "nah, you're f**king dumb." *Id.* Sedam continued calling Cardenas names, and Cardenas and his teammates decided to leave the CVS.

[10] As Cardenas neared the exit, Sedam was "still cussing [him] out," and Cardenas "put [his] hoodie back on." *Id.* at 46-47. Sedam responded: "oh, you want me to come take that f**ker off," and he then started pulling on Cardenas's hoodie. *Id.* at 47. Cardenas broke free from Sedam's grasp, at which point Sedam withdrew a sidearm, placed Cardenas into a choke hold, and held a gun against Cardenas's head. Sedam used Hispanic-oriented racial slurs against Cardenas and exclaimed that he would "kill this guy." *Id.* at 48. A bystander called law enforcement, who arrived shortly thereafter and, after

reviewing surveillance video, released Cardenas. A few weeks later, officers arrested Sedam.[2]

[11] Thereafter, Cardenas filed his complaint against CVS, Protos, Shield, and Sedam. CVS moved for summary judgment on the ground that it could not be held liable for Sedam's actions under the doctrine of respondeat superior, as alleged by Cardenas,[3] because Sedam was an independent contractor and not a CVS employee. The trial court agreed and entered summary judgment for CVS. The court entered the summary judgment for CVS as a final judgment pursuant to Indiana Trial Rule 54(B), and this appeal ensued.

## Standard of Review

[12] Cardenas appeals the trial court's entry of summary judgment for CVS. Our standard of review is well settled:

> When this Court reviews a grant or denial of a motion for summary judgment, we "stand in the shoes of the trial court." Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

[2] Sedam eventually pleaded guilty to Level 5 felony intimidation, Level 5 felony criminal confinement, and Level 6 felony pointing a firearm, for which he was sentenced to an aggregate term of seven years with six years suspended to probation. One condition of Sedam's suspended sentence was for him "to remain on mental health counseling for the entire length of probation[] unless . . . discharged . . . [as] no longer necessary." Appellant's App. Vol. 4, p. 173.

[3] Cardenas concedes that he did not pursue a theory of direct liability against CVS in the trial court. *See* Appellant's Br. at 11 n.2.

law." We will draw all reasonable inferences in favor of the non-moving party. We review summary judgment de novo.

*Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1067-68 (Ind. 2022) (citations omitted).

## A reasonable fact-finder could conclude that Sedam was CVS's employee for purposes of respondeat-superior liability.

[13] The dispositive issue in this appeal is whether a reasonable fact-finder may conclude from the designated evidence that Sedam was a CVS employee for purposes of holding CVS liable under the doctrine of respondeat superior. Under that doctrine, liability may be imposed on an employer for acts committed by an employee that are within his scope of employment. *Barnard v. Menard, Inc.*, 25 N.E.3d 750, 755 (Ind. Ct. App. 2015) (citing *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008)). As we have summarized:

> Generally, a principal is not liable for the acts of independent contractors. *Gwinn v. Harry J. Kloeppel & Assocs., Inc.*, 9 N.E.3d 687, 691 (Ind. Ct. App. 2014). The rationale behind this rule is that a "'general contractor typically exercises little, if any, control over the means or manner of the work of its subcontractors, and requires only that the completed work meet the specifications of the owner in its contract with the general contractor.'" *Shawnee Constr. & Eng'g, Inc. v. Stanley*, 962 N.E.2d 76, 81 (Ind. Ct. App. 2011) (quoting *Harris v. Kettelhut Constr., Inc.*, 468 N.E.2d 1069, 1072 (Ind. Ct. App. 1984)).

> Whether one acts as an employee or an independent contractor is generally a question of fact, but if the underlying facts are undisputed, then the court may properly determine a worker's—

or corporate entity's—classification as a matter of law. *Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001). . . .

To distinguish between employees and independent contractors, we apply a ten-factor analysis:

> []([1]) the extent of control which, by the agreement, the master may exercise over the details of the work;

> ([2]) whether or not the one employed is engaged in a distinct occupation or business;

> ([3]) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

> ([4]) the skill required in the particular occupation;

> ([5]) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

> ([6]) the length of time for which the person is employed;

> ([7]) the method of payment, whether by the time or by the job;

> ([8]) whether or not the work is a part of the regular business of the employer;

> ([9]) whether or not the parties believe they are creating the relation of master and servant; and

([10]) whether the principal is or is not in business.[]

> *Id.* at 1010 (quoting Restatement (Second) of Agency § 220(2) (1958)). We consider all factors, and no single factor is dispositive. *Id.*

*Id.* at 755-56 (citations omitted). We consider those ten factors in turn.[4]

## 1. Control over the details of the work

The "leading factor" from the above list is the first—control. *Moberly*, 757 N.E.2d at 1013. Indeed, as our Supreme Court has recognized, an "employee" is one "employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Id.* at 1010 (quotation marks omitted). On this factor, the parties dispute the comparability of the instant record with the record we considered in *Barnard*.

In *Barnard*, Menard, Inc. was in the business of selling home-improvement products, and it entered into an agreement with Blue Line LP, under which

---

[4] In his Reply Brief, Cardenas asserts that CVS has waived its argument that factors 6, 7, 8, and 10 favor independent-contractor status because CVS conceded in the trial court that those factors either favor Cardenas or are neutral. We decline to find waiver here, however, for two reasons. First, CVS's argument on appeal that those factors now favor independent-contractor status is less of a "new argument" and more of a new conclusion from the same argument. *Cf. McGill v. Ling*, 801 N.E.2d 678, 687 (Ind. Ct. App. 2004) ("Generally, a party may not raise an issue on appeal that was not raised to the trial court, even in summary judgment proceedings."), *trans. denied*. Second, given our de novo review of summary judgments, our Supreme Court has made clear that "we will affirm the trial court's ruling based on any theory supported by record evidence." *Markey v. Estate of Markey*, 38 N.E.3d 1003, 1006-07 (Ind. 2015). It is therefore within CVS's rights as the appellee here to argue that the trial court's judgment is supported by the designated evidence.

Blue Line would provide security services at Menard's stores. The Menard-Blue Line contract provided as follows:

> Blue Line's primary duties include the prevention of "the loss of merchandise, property and shoplifter apprehension." The Contract further stipulates that "[n]othing in this Agreement shall be construed in any manner to create an agency or employer-employee relationship between Menard[] and [Blue Line], and it is expressly understood, acknowledged and agreed that [Blue Line] is an independent contractor." Finally, the Contract requires that Blue Line shall "defend, indemnify and hold harmless Menard[], its agents and its employees from any liability, damages, expenses, claims, demands, actions or causes of action, including attorney fees, arising out of the work hereunder . . . ."

*Barnard*, 25 N.E.3d at 753 (alterations and ellipsis in original; record citations omitted). The contract further provided that "Blue Line was in charge of the manner in which its work was to be done, unless Menard notified Blue Line" twenty-four hours in advance of new requirements. *Id.* at 756.

[16] In March 2010, Arthur Barnard was leaving an Indianapolis Menard's store when a Blue Line loss-prevention officer physically accosted and injured him. Barnard sought to hold Menard liable under the doctrine of respondeat superior for the loss-prevention officer's conduct. The trial court entered summary judgment for Menard, and, on appeal, we affirmed in relevant part on the ground that Blue Line was an independent contractor of Menard. *Id.* at 757.

[17] In analyzing the factor of Menard's control over Blue Line, we explained:

the record reveals that Blue Line was in charge of the manner in which its work was to be done, unless Menard notified Blue Line in writing or orally. If Menard notified Blue Line of new requirements, Blue Line would have twenty-four hours to meet those new requirements. Formal notification and a twenty-four-hour time period in which to make changes is more consistent with an independent contractor classification than an employee classification. Moreover, Menard only has the right to request changes in *what* Blue Line was responsible for doing, not in *how* those responsibilities were to be carried out. All of these rights are more analogous to that of an independent contractor than that of an employee. Therefore, we find that this factor weighs in favor of an independent contractor classification.

*Id.* at 756 (emphasis in original; record citation omitted).

[18] Unlike the contract at issue in *Barnard*, CVS's Service Agreement with Protos— and, by extension, CVS's relationship with Shield and Sedam—details control by CVS over the manner in which on-duty guards were to perform their security services. The Service Agreement provided that Protos would render services "in accordance with CVS'[s] requirements as determined at CVS'[s] sole discretion and as attached hereto," which requirements CVS reserved the right to amend "from time to time" in its sole discretion. Appellant's App. Vol. 2, p. 72. Further, an on-duty guard's compliance with the stated standards would be determined by CVS at Protos's "sole expense and risk of loss." *Id.*

[19] The Service Agreement then goes well beyond merely hiring Protos for security services and extends into directing how on-duty guards must carry out those services. Specifically, for unarmed guards, the Service Agreement requires as follows:

**General Overview**: The following guidelines are provided for contracted uniform guard services. The Primary purpose of the Security Guard is to provide asset protection from theft by customers . . . and deterring unwanted behavior.

Security Officer's **Responsibilities and Duties**:

- Security Officer must be professional, courteous, well mannered, and exhibit self-control at all times.
- Security Officer must provide customer service while focusing on specific brands including but not limited to Beauty, Shave, Oral, Liquor and other High Priority categories.
- Security Officers are to maintain a high profile presence in the store. They should be primarily focused on the front end sales area and entrance(s), with quick visual tours of the store interior and exterior of the building once an hour for 10 minutes each day and to document this on a sheet for future use if needed[.]
- The patrol area will be outside of the store on the sidewalk to the end of the CVS building.
- If the guard encounters loiterers or homeless people not moving on the sidewalk, the security guard will ask the person(s) to leave. If the persons(s) refuse to leave, the guard will inform [the] CVS Store Management team.
- At no time should you try to physically restrain the person.
- Security Officers may not have in their possession any weapons, including but not limited to firearms, batons, mace, handcuffs or other similar devices.
- Security Officers will wear issued uniforms and identification badges at all times while on duty.
- Security Officers are to act as support to management in shoplifting situations or hostile customer situations. Management will be the primary representative of CVS in these situations.
- Security Officers should report suspicious activity to the CVS store management and provide apprehension support[.]

- Should an apprehension of a shoplifter become physically dangerous or there is a verbal or visible threat of harm made to CVS personnel or customers, Security Officers should observe the activity and record any information that will help with the investigation.

Please note: Under all circumstances, the Security Officer shall avoid making an apprehension of any kind; provided, however, the Security Officer may contact local police and/or emergency personnel upon direction of the store management or when it is reasonably determined that store personnel and customers are being threatened and/or in danger of harm, and during such time provide a physical presence to deter [sic]. **At no time should you try to physically restrain the person.**

**Miscellaneous**:

- Security Officers are never to give chase to a fleeing customer or associate.
- At no time is it appropriate for a guard to be seated while on duty, nor should a guard be behind the checkout areas, the Pharmacy or the office areas.
- Security Officers are not allowed to be on their personal cell phones or any other non[-]approved electronic devices while on duty.
- In case of fire or other emergency evacuations, Security Officer[s] shall have no duty other than to call for local emergency services.
- Security Officer[s] will not fraternize with CVS associates or customers on or off duty.
- Security Officer[s] while on duty on CVS property will not address any questions presented by the news media. Politely state you are not a CVS employee and refer the inquiry to a member of CVS Management.
- Smoking is prohibited on store property. This includes outside of [the] store, [in] parking lots or in view of [the] public.
- If Security Guard coverage is for a Conditional Use Permit (CUP) store the Security Guard[']s responsibility is to patrol the Liquor aisles

and adhere to all the Security Guard Responsibilities and Duties outlined above.

- If Security Guard coverage is due to Pharmacy the Security Guard should provide a strong security presence and deter unwanted behavior outside the immediate pharmacy area.

*Id.* at 96-97 (bold font in original).

Similarly, for armed guards, the Service Agreement provides:

The primary purpose of the Armed Guard is to provide asset protection from theft by customers . . . and deterring unwanted behavior.

**Armed Guard's Responsibilities and Duties**

- Maintain a professional appearance.
- Be courteous and customer service oriented.
- Adhere to the schedule provided by CVS . . . to ensure appropriate coverage.
- Armed Guards are to maintain a high profile presence in front of the store and do the following:
  - Focus on all points of entr[y]/exits and interior of the store.
  - Report suspicious activity to the CVS store management.
  - Document all suspicious activity observed.
  - Act as support to management in shoplifting situations, or hostile customer situations. (Management will be the primary representative of CVS in these situations[.])
  - Notify the CVS manager on duty when leaving the post for any reason.
- **Do not lock the doors to attempt to hold shoplifters in a CVS store[.]**
- **Do not draw your weapon unless it is a *life threatening* situation[.]**
  - **Do not discharge firearms and/or the use of weapons of any kind excluding the duty of Armed Security Guards to defend the**

**lives of themselves and others, only where injury or death seems likely to be suffered by the Security Guard and/or one or more individuals the Armed Guard is to protect[.]**

- **In the absence of self-defense or the defense of others Armed Security Guards shall not withdraw[] any firearm from its holster, inspect, load or unload ammunition, brandish, and/or handle any firearm while on duty at any CVS store location[.]**

- **All firearms carried by Armed Security Guards shall remain highly visible and in plain view at all times while on duty. Coats, vest[s], sweaters, and/or other garments that may obscure any firearm carried by an Armed Security Guard shall be prohibited and shall not be worn by Armed Security Guards inside any CVS store location[.]**

- Do not discharge your duties by discrimination against any customer or CVS store associate based on race, sex, or religious affiliation.

- At no time is it appropriate to be seated while on duty[.]

- At no time should you physically try to restrain a person[.]

- Armed Guards must wear issued uniforms and identification badges at all times while on duty[.]

- Armed Guards are not to be behind the checkout areas, in the pharmacy, or in the CVS office.

- Personal cell phones or any other non-approved electronic devices are prohibited while on duty, except in case of an emergency.

- Do not fraternize with CVS associates or customers while on duty.

- Do not address any questions presented by the news media while on duty and on CVS property. If an Off Duty Officer is asked to respond to a question or make comment on a situation by a reporter, the Off Duty Officer should politely state that she/he is not a CVS employee and refer the inquiry to a CVS store manager.

Miscellan[eous]:

- Off Duty Officers will wear uniforms issued by their law enforcement department[s] and identification badges at all times while on duty.

This is desired for its visual deterrent to potential robbery or burglary situations[.]

- Off Duty Officers employed . . . as guards should address any criminal activity observed while on duty as required by their individual law enforcement agencies and state and local law.
- Smoking is prohibited on store property. This includes outside of [the] store, [in] parking lots or in view of public.

*Id.* at 98-99 (bold, underlining, and italics in original).

[21]     Those requirements show that CVS controls numerous details of the work of on-duty guards. CVS requires all guards to provide customer support, managerial support, and record-making for CVS's benefit. CVS even requires unarmed guards to "provide customer service while focusing on specific brands" that CVS has determined to be of high priority. *Id.* at 96. CVS controls the guards' schedules, where they may be within the store, and with whom they may fraternize.

[22]     And CVS specifically directs how on-duty guards are to perform their security work. They are to be in visually conspicuous locations and perform patrols once per hour for ten minutes. They are to avoid physically restraining customers absent specified circumstances. They are to assist management in reporting suspicious activity, apprehension support, and criminal activity inside or about the stores. They are not to give chase or to be seated. Unarmed guards are not permitted to have any type of weapon, including "handcuffs or other similar devices." *Id.* at 96. Armed guards must have their weapons "highly visible" and may not wear clothing that obstructs the view of the firearm, and they may not

draw their weapon unless doing so is necessary to defend the lives of themselves or others. *Id.* at 98.

[23] A reasonable fact-finder could conclude from this record that the extent of control that CVS, under the Service Agreement, exercises over the details of the guards' work favors classifying the CVS-Protos (and, again, by extension, CVS-Shield and CVS-Sedam) relationship as an employer-employee relationship.

## 2. Distinct occupation or business

[24] The second factor "considers whether or not the one employed is engaged in a distinct business or occupation." *Pfadt v. Wheels Assured Delivery Sys., Inc.*, 200 N.E.3d 961, 974 (Ind. Ct. App. 2022) (quotation marks omitted). That is, "[i]f the employed person performs the same type of work for multiple employers, that fact weighs in favor of finding the person to be an independent contractor." *Id.*

[25] Here, CVS is in the pharmacy retail business and Protos is in the security services business. While those business needs may overlap, they are distinct business operations. And there is no question that the Service Agreement enabled CVS to hire from other security service providers and that Protos likewise could sell its security services to entities other than CVS. Likewise, there is no question that Sedam's presence at a given CVS location was not through CVS directly but through Protos via Shield. This factor weighs in favor of classifying the guards provided under the Service Agreement as independent contractors.

### 3. Kind of occupation

[26] The third factor "focuses on whether the kind of occupation involved consists of work usually done under the direction of an employer or by a specialist without supervision." *Id.* at 975 (quotation marks omitted). "If the work is done by a specialist without supervision, this factor weighs in favor of an independent contractor status." *Id.*

[27] CVS notes that the Service Agreement required Protos's guards to have "requisite knowledge, expertise, and qualifications . . . necessary to perform" their tasks. Appellant's App. Vol. 2, p. 80. But CVS disregards that the Service Agreement gives CVS supervisory authority over the guards' work while they are present at CVS locations. Further, we agree with Cardenas that CVS's detailed work requirements in many respects render the guards assistants to CVS's store managers. A reasonable fact-finder could conclude that this factor weighs in favor of classifying the guards as CVS employees.

### 4. Skill required

[28] "Unskilled labor is usually performed by employees, while skilled labor is often performed by independent contractors." *Pfadt*, 200 N.E.3d. at 975 (quotation marks omitted). In *Barnard*, we concluded that this factor weighed in favor of an independent-contractor classification for Blue Line where the contract warranted that Blue Line's employees "shall have been duly trained" by Blue Line and "known" by Blue Line "to perform the services . . . in a professional manner adequate in the occupational community but of no less quality and

standards that are generally in existence in the industry." 25 N.E.3d. at 756. The Menard-Blue Line contract further expressly identified Blue Line as "the expert in this field" upon which "Menard[] is relying." *Id.*

CVS asserts that the Service Agreement's requirement that Protos provide guards of a certain but unspecified requisite knowledge, expertise, and qualification is equivalent to the language in the Menard-Blue Line contract. We cannot agree. Nothing in the instant record demonstrates that Protos or its subcontractors were considered "expert[s] in this field" or that, based on *that* expertise, Protos would assure the training of its guards. *See id.* While there are references in the armed-guard requirements to off-duty law enforcement officers, there is no *requirement* that any guards have that background.

Accordingly, a reasonable fact-finder could conclude that this factor weighs in favor of classifying the guards as unskilled labor and, thus, employees.

## 5. Supplier of instrumentalities

"This factor is a consideration of whether the employer or the worker supplied the instrumentalities, tools, and place of work." *Pfadt*, 200 N.E.3d at 976 (quotation marks omitted). "This factor cuts toward employee status if the employer provides tools or instrumentalities of substantial value, and it points toward independent contractor status if the workman provides the items." *Id*.

There is no dispute that CVS provided the place of work. There is also no dispute that Sedam was required to purchase his own uniform for $30 from Shield and that Sedam carried his own firearm. A reasonable fact-finder could

conclude that this factor is "neutral" or otherwise not significant in determining whether a guard provided to CVS under the Service Agreement should be classified as an employee or an independent contractor.

## 6. Length of employment

[33] Unsurprisingly, "[e]mployment over a considerable period with regular hours or performance of continuous service for another indicates employee status." *Id.* In *Barnard*, the Menard-Blue Line contract "had been in place since 2007," approximately three years before the relevant incident; the contract had no end date; and "the loss prevention services were provided by Blue Line on a regular and consistent basis." 25 N.E.3d at 757. We concluded that that evidence weighed in favor of an employee classification. *Id.*

[34] Here, CVS and Protos entered into the Service Agreement less than one year before the incident with Sedam, and the Service Agreement had a three-year term. We conclude that our analysis in *Barnard* is therefore distinguishable here; however, we also conclude that a reasonable fact-finder could find this factor to be neutral given the recency in which CVS and Protos had executed the Service Agreement.

## 7. Method of payment

[35] "Sporadic payments in lump sum amounts for each job performed, instead of payments by the hour or on a weekly basis[,] are more typical of an independent contractor than an employee." *Id.* In *Barnard*, we noted that the Menard-Blue Line contract "provided that Menard would pay Blue Line by the

hour for the work done by the loss prevention officers." *Id.* We thus found that this factor weighed in favor of an employee classification. *Id.*

So too here. Under the Service Agreement, CVS pays Protos by the hour for the work done by the provided guards. And, despite CVS's argument on appeal, what Protos did with the money upon receipt of CVS's payment is not obviously relevant to this analysis. Accordingly, a reasonable fact-finder could conclude that this factor favors an employee classification.

### 8. Regular business of employer

This factor looks to whether the work at issue is a part of the regular business of the employer. *Id.* As we stated in *Barnard*, "[s]ecurity is distinct from sales, but [it] is a necessary part of the sales business. Consequently, this factor is neutral." *Id.* We agree and conclude that a reasonable fact-finder could find this factor to be neutral on this record.

### 9. Belief of the parties

Cardenas properly concedes that the Service Agreement unambiguously demonstrates that CVS and Protos believed Protos to be an independent contractor to CVS. This factor therefore weighs in favor of an independent-contractor status.

### 10. Whether the principal is in business

Similarly, CVS concedes that it is in business and, thus, that this factor weighs in favor of an employee status.

## 11. Summation

A reasonable fact-finder could conclude from this record that factors 1, 3, 4, 7, and 10 favor classifying Protos and the guards provided by Protos as employees of CVS for purposes of respondeat-superior liability. A reasonable fact-finder could likewise conclude that factors 5, 6, and 8 are of neutral weight on this record. Meanwhile, CVS has demonstrated that only factors 2 and 9 are in its favor. Accordingly, a reasonable fact-finder could conclude that Sedam was, for purposes of respondeat-superior liability, an employee of CVS at the time he attacked Cardenas.[5]

# Conclusion

For all of these reasons, we reverse the trial court's entry of summary judgment for CVS and remand for further proceedings.

Reversed and remanded.

Kenworthy, J., concurs.
Brown, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT

Richard A. Waples
Waples & Hanger
Indianapolis, Indiana

---

[5] Given our holding on this issue, we need not consider Cardenas's alternative theory that CVS may be found liable under the inherently-dangerous exception to liability for independent contractors.

Thomas C. Crooks
Law Office of Thomas C. Crooks
Chicago, Illinois


ATTORNEYS FOR APPELLEE HOOK-SUPERX, LLC

Katherine M. Haire
Nicholas G. Brunette
Joseph A. Zumpano, III
Reminger Co., L.P.A.
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE SHIELD PROTECTION SOLUTIONS, LLC

Christopher A. Pearcy
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

**Judge Brown, dissenting.**

[43] I respectfully dissent from the majority's decision to reverse the trial court's entry of summary judgment in favor of CVS. The factors set forth in *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001), to distinguish employees from independent contractors, must be weighed against each other as a part of a balancing test as opposed to a mathematical formula. *Palmer v. Ake*, 181 N.E.3d 421, 430 (Ind. Ct. App. 2021), *trans. denied*. No single factor is dispositive. *Id*. at 427.

[44] I agree with the majority that Sedam, as an employee of Shield, was engaged in a business or occupation distinct from that of CVS, that the parties believed Sedam was not an employee of CVS but worked for a sub-contractor, and that these factors weigh in favor of the conclusion that Sedam was an independent contractor. However, unlike the majority, I believe that many of the remaining factors also favor the conclusion that Sedam was an independent contractor.

[45] With respect to the degree of control of the work, courts have examined the extent to which a worker was instructed as to the particulars of how to accomplish assigned tasks, the degree the worker controlled the method and details of the tasks, and the degree to which the purported employer exercised actual control over the means, manner, and method by which the worker discharged the worker's duties and supervised or directed the work. *Id*. The Service Agreement sets forth "guidelines . . . for contracted uniform guard services" including to be professional, maintain a high profile presence in the store, and wear issued uniforms and identification badges while on duty.

Appellant's Appendix Volume II at 96. The provisions which require the guard to report suspicious activity to CVS management, to patrol the store and outside area, to assist management in shoplifting and hostile customer situations, and to ask loiterers or homeless people to leave, are customary duties for a guard to perform, whether classified as an independent contractor or an employee, and the fact those duties were included in the guidelines does not demonstrate that CVS "exercised actual control over the means, manner, and method by which the worker discharged the worker's duties." *See Palmer*, 181 N.E.3d at 427. The Service Agreement does not contemplate that a guard receive step-by-step supervised instruction by CVS management. Also, the provision that guards not address questions by the news media but state they are not CVS employees and refer inquiries to CVS management does not support a finding that the guards are employees. I would find that the factor regarding the degree of control of the work weighs in favor of the conclusion that Sedam was an independent contractor.

[46] As for the kind of occupation, security may be hired as unsupervised specialists or as employees working under direct supervision. CVS's Service Agreement with Protos (which included provisions regarding the term, scope of work, and billing procedures), Protos's sub-contractor agreement with Shield (including services and billing terms), and Shield's employment agreement with Sedam reflect that, here, CVS hired security officers as specialists and not as employees working under direct supervision. Moreover, while CVS's Service Agreement provides guidelines for contracted guards and states they will assist

management in shoplifting and hostile customer situations, the guidelines are not so detailed so as to render the guards assistants to CVS's store managers as stated by the majority. In my view, this factor favors a determination that Sedam was an independent contractor.

[47] With respect to the skill required, while the Service Agreement does not require that security staff have particular education or training, it requires that the vendor provide the necessary training for guards prior to assignment. I would find this factor to be neutral or not particularly helpful to our determination.

[48] As for who supplied the tools or instrumentalities to perform the work, while he worked at a CVS location, Sedam was required to purchase his own uniform from Shield, and he carried his own firearm. Shield agreed to furnish Sedam with the supplies to perform his duties. This factor slightly favors the conclusion that Sedam was an independent contractor.

[49] Regarding the duration of the work, while CVS and Protos executed the Service Agreement with a three-year term, and Protos in turn subcontracted with Shield, Shield could utilize Sedam or other security staff to fulfill its obligation. This factor favors an independent contractor finding.

[50] With respect to the method of payment, the Service Agreement provided that Protos would be paid based on an hourly fee schedule and that Protos would submit invoices to CVS on a monthly basis. The Service Agreement further provided that Protos "will be responsible for providing its own workers compensation, unemployment, and other coverages required by law" and "will

be responsible for all taxes (including but not limited to Federal, State, local, FICA) as applicable and required by law." Appellant's Appendix Volume II at 80. The agreement between Protos and Shield, in turn, provided that Protos would pay for work actually performed, that Shield would submit either a weekly or biweekly bill for services, and that "[Shield], and not [Protos], shall be responsible for paying all salaries, bonuses, and benefits due to the Security Officers as well as Federal and\or state or local Taxes, Social Security Taxes, Unemployment Compensation Taxes and Workman's Compensation." *Id*. at 138. Sedam's employment agreement with Shield provided that he would be paid a base wage per hour, payable in bi-weekly installments, subject to standard withholding. The IRS requires employers to report wage information for employees and to determine withholding from an employee's wages. *Palmer*, 181 N.E.3d at 429. Sedam was not a payroll employee of CVS, and there is no indication that taxes were withheld by CVS. This factor favors an independent contractor finding. *See id*. at 429-430 ("While the facts that Palmer was paid by the hour and the checks were issued by Fas-Pak may tend to support the conclusion that he was an employee, the facts that Ake told Palmer that no taxes would be withheld for him for the project and that he would not be a regular payroll employee of Fas-Pak tend to support the conclusion that he was an independent contractor. That no taxes were withheld by Fas-Pak under the circumstances is significant.").

[51] As for CVS's regular business, as the majority notes, CVS is in the pharmacy retail business and Protos is in the security services business, and while those

business needs may overlap, they are distinct business operations. This factor is not particularly helpful to our determination.

[52] While some of the facts and factors may be neutral or not particularly helpful, I would find that overall, when weighed against each other, they support the conclusion that Sedam was an independent contractor, and I would affirm the trial court's entry of summary judgment.[6]

---

[6] Cardenas asserts that, "[e]ven if Sedam was deemed an independent contractor, CVS would still be liable for [Sedam's] actions because the position of an armed security officer is inherently dangerous." Appellant's Brief at 27 (citing *Barnard v. Menard, Inc.*, 25 N.E.3d 750, 758 (Ind. Ct. App. 2015) (noting "circumstances in which a principle can be liable for the negligence of an independent contractor" include "where the contract requires the performance of inherently dangerous work")). This Court has said the "inherently dangerous" exception "is typically associated with strict liability and does not require negligence on the part of the independent contractor." *Selby v. N. Indiana Pub. Serv. Co.*, 851 N.E.2d 333, 337 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*. Whether an activity "is abnormally dangerous" is a question of law for the court. *Id.* at 338. According to Cardenas, CVS maintained below that Sedam was hired as an unarmed security guard. The Service Agreement's guidelines for an unarmed guard provided that guards may not have any firearm in their possession and that at no time should a guard try to physically restrain a person. Under the circumstances, I would conclude as a matter of law that CVS did not require the performance of inherently dangerous work and therefore that the trial court did not err in entering summary judgment. *See Castellanos v. Tommy John, LLC*, 321 P.3d 218, 226 (Utah Ct. App. 2014) (noting courts that have held the provision of security services is not inherently dangerous) (citing *Abbott v. Town of Salem*, No. 05-CV-127-SM, 2007 WL 764483, at *3-4 (D.N.H. Mar. 12, 2007) (concluding mall manager was not liable for torts committed by the employees of an independent-contractor security company because the "provision of security services . . . does not constitute an inherently dangerous activity"); *Schreiber v. Camm*, 848 F. Supp. 1170, 1177-1180 (D.N.J. 1994) (determining estate owner was not liable for torts committed by employees of independent-contractor security company because "the deployment of an armed security guard is not an inherently or abnormally dangerous activity, absent knowledge (imputed or actual) of the dangerous propensities of the security guard"); *Brien v. 18925 Collins Ave. Corp.*, 233 So.2d 847, 848-849 (Fla. Ct. App. 1970) (armed security work is not inherently dangerous and "in the absence of an allegation that the owner had or ought to have had notice of the dangerous propensities of the guard employed by the security corporation, the owner will not be liable for consequences of the allegedly negligent manner in which the employee of the independent contractor performed his duties")).